In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3682

KEVIN G. SIMILA,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 C 29—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 29, 2008—DECIDED JULY 22, 2009

Before CUDAHY, POSNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Once a strapping construction laborer, Kevin Simila claims that a mysterious pain disorder has withered his physical prowess and left him unable to work. Simila applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). But after a hearing, the administrative law judge ("ALJ") was dubious of the severity of Simila's limitations.

And for good reason. The record showed that Simila had gone hunting and fishing, attended his sons' peewee hockey games, and even helped a friend build a log home—all after the time Simila claimed to have become disabled. But no matter how fishy a claim for Social Security benefits might seem, an ALJ must follow the same rules for every case. She must refrain from "playing doctor," properly evaluate the medical evidence and the claimant's credibility, and accurately incorporate the claimant's limitations into any hypothetical question used to elicit the opinion of a vocational expert. Despite Simila's contentions to the contrary, we think that the ALJ adequately performed these duties in this case. The medical evidence lent little support to Simila's case and the ALJ had good reason to doubt Simila's testimony. And though imperfect, the ALJ's hypothetical questions adequately described Simila's condition. We therefore affirm.

## I. Background

### A. Kevin Simila's Symptoms and Treatment

Until Simila's symptoms began in 2002, he worked as a construction laborer and an occasional carpet installer and bartender. In mid-September of that year, Simila went to his primary care physician, Dr. Enders, complaining of flu-like symptoms, headaches, and joint pain. Dr. Enders, on staff at the Midelfort Clinic, examined Simila and performed several diagnostic tests. He did not observe any apparent joint swelling, and Simila's test results for Lyme Disease were negative. During this visit, Simila admitted to having abused cocaine intravenously

in the past but stated that he never shared needles and had been drug-free for fifteen years.

Simila stopped working construction around October 2, 2002 and returned to the Midelfort Clinic several times throughout October complaining of similar symptoms. Dr. Enders noted that Simila had "arthralgias [joint pain] and myalgias [muscle pain] of undetermined etiology" and prescribed Vicodin to ease the pain. As for his headaches, a CT scan revealed that Simila had a sinus infection. Dr. Enders referred Simila to Dr. Bartynski, an otolaryngologist, who examined Simila and surgically drained his sinuses. The procedure did not alleviate the headaches, though.

Simila's symptoms continued throughout the rest of 2002. He continued to see a number of doctors and take pain medications such as Vicodin and Percocet during that time. He saw two neurologists, Dr. Chukwudelunzu and Dr. Dexter, who each examined Simila but could not determine the cause of his pain. Dr. Chukwudelunzu found that Simila "demonstrate[d] adequate fund of knowledge, attention, concentration and memory during history and neurologic examination," and that Simila had normal muscle strength, coordination, and reflexes. Dr. Chukwudelunzu diagnosed Simila with chronic headaches but noted that "I think this will turn out to be a chronic daily headache with possible super-imposed narcotic-induced headache," referencing Simila's pain medication. Dr. Chukwudelunzu changed Simila's prescription to taper his Percocet use and control his pain with other medications (Simila still continued to

use Percocet, though). Dr. Dexter concluded similarly. He diagnosed Simila with "diffuse myalgias and headache, etiology unclear," observing that his muscle strength was normal, except for some "giveaway weakness," a sign that Simila might have been exaggerating the effects of his pain, *see* MURIEL D. LEZAK ET AL., NEUROPSYCHOLOGICAL ASSESSMENT 326 (4th ed. 2004) ("Neurological examiners repeatedly noted *give-away weakness* (poor effort on strength testing) indicating that [the patient] was actively preserving a disability status." (emphasis is original)). In addition, like Dr. Chukwudelunzu, Dr. Dexter concluded that the longer Simila used narcotic pain medications, the more likely it was that the narcotics contributed to his headaches.

Dr. Dexter also noted that Simila had been "somewhat active" despite his pain. Simila had explained to Dr. Dexter that he "was able to go out deer hunting" and "has been able to go out and take his son to hockey and father/son hockey games," even though he experienced discomfort and soreness the next day.

Simila also saw a rheumatologist, Dr. Shelley, who, like other doctors, found little explanation for Simila's complaints. Dr. Shelley observed that Simila had no swelling in any of his joints, a normal grip strength, and a "full range of motion without pain" in his wrists, elbows, shoulders, hips, knees, ankles, and feet. Dr. Shelley diagnosed "arthralgias and myalgias of uncertain etiology" and "headaches," and noted that he did "not see evidence to suggest the significance of an arthritic condition."

Throughout this time, Simila did not work and drew disability compensation from his union. Dr. Enders and Dr. Bartynski each twice signed off on Simila's disability forms. On the second of Dr. Enders's forms, completed December 3, Dr. Enders noted that Simila had been continuously disabled from October 2, 2002 through "indefinite."

In 2003, Simila continued seeing Dr. Enders and also began treatment at the Mayo Clinic. At Mayo, he repeated his complaints of headaches and back, joint, and muscle pain, especially during physical activity. Doctors noted that Simila described how his joints hurt after he helped a friend replace a gas tank and how his fingers would become numb when he used a hammer or went bowhunting. Several tests gave some explanation for Simila's back problems. In Simila's lumbar spine, tests showed "degenerative disk disease with slight narrowing of the 3rd and 4th lumbar disks with broad-based disk bulges and small associated annular tears," and in his cervical spine, tests showed "mild degenerative changes." However, doctors noted that Simila's spine had a normal pain-free range of motion with "a slight increase in pain with aggressive palpation of the right sacroiliac joint." Doctors also found that Simila had full range of pain-free motion in all four extremities. In addition, like the doctors at Midelfort, multiple doctors at Mayo noted that Simila was overusing his pain medication; they did note, though, that Simila expressed interest in getting off of it. Simila continued to receive disability payments from his union, and Dr. Enders's colleague, Dr. Usher, signed off on Simila's union disability form.

Simila's doctors tried several different forms of treatment to reduce his pain, some of which were more successful than others. Physical therapy was one of the less effective. Noting that Simila "enjoys hunting, fishing, and four wheeling and playing hockey," the therapist developed a treatment plan for Simila with the goal of reducing Simila's symptoms by 50-75%. But Simila never returned after the first session and was subsequently discharged. Doctors also tried additional medications, which had some temporary success. Dr. Enders prescribed Depakote for headaches, and after a month, Simila reported that his headaches were "much less frequent." By March 2003, Simila reported he was "about 90% better."

Dr. Enders also prescribed Prednisone, a steroid, to improve Simila's muscle and joint pain. The Prednisone was so effective that after two weeks Simila reported a marked decrease in pain; Simila said "it is all gone." Dr. Enders noted that "he was feeling so good that he has been doing some fairly heavy work for the last week involving peeling logs and helping to build a log home." Simila reported only normal muscle soreness and stiffness after that work. Simila also instructed Dr. Enders not to complete another union disability form, and around April 2003, Simila returned to work as a construction laborer. But it didn't last. Due to Prednisone's side effects, Simila's doctors reduced the dosage, after which Simila complained that his pain symptoms had flared back up. Simila stopped work again sometime during the summer or fall of 2003. (Although the ALJ found Simila to only have worked during June and July, some medical records indicate that Simila was working as late as September.)

Doctors continued to try different medications to treat Simila's pain but saw limited success. They tapered Simila off Prednisone and started him on Enbrel, a medication for joint pain taken by injection, which worked relatively well at first (Simila reported "about 75 percent improvement of his symptoms"). But again Simila's complaints of pain returned, and in November 2003, Simila sought Dr. Kent, a rheumatologist, to approve his union disability form. Dr. Kent signed the form but wrote, "While his musculoskeletal pain makes hard physical labor extremely difficult, I see no reason he couldn't perform clerical work, etc." Simila had also returned to using narcotic pain medications, such as Vicodin.

At this point, Simila's doctors had become increasingly uncertain of the cause of Simila's pain. They initially thought it was spondyloarthropathy, an inflammatory joint disease, but Simila had no response to a medication that targeted that disease. Dr. Kent opined that Simila's joint pain was most likely related to "chronic pain syndrome," and another doctor suggested "myofascial pain syndrome/fibromyalgia" due to a lack of any objectively observable inflammation. When Dr. Kent was again asked to complete Simila's union disability form, he noted that he told Simila "it is unclear to me why he is totally disabled, and this makes it difficult for me then to fill out his forms and make any predictions about the future." Dr. Kent eventually signed the form and indicated that Simila was disabled from October 15, 2003 through "currently."

In December 2003, Dr. Muceno, a Wisconsin state medical consultant, reviewed Simila's medical records to determine his "residual functioning capacity." Dr. Muceno concluded that Simila could lift or carry up to fifty pounds occasionally and twenty-five frequently; that Simila could stand, walk, or sit for a total of six hours in an eight-hour workday; and that Simila had no postural, manipulative, visual, communicative, or environmental limitations. (This report was subsequently confirmed by another state medical consultant several months later.)

By 2004, Simila's doctors appeared to have few remedies left to try; Dr. Michet, a rheumatologist at the Mayo Clinic, noted that Simila's treatment was "at an impasse." Dr. Michet recommended three infusions of Remicade, a drug used to treat autoimmune disorders, and stated that if Simila had not improved after that, "then we are going to have to conclude that he has developed more of a fibromyalgic or myofascial chronic pain disorder. . . . [T]he next step for managing that would be a chronic pain rehab consultation." After the infusions, Simila had not improved. X-rays were taken of Simila's spine, which again revealed "mild degenerative changes." Simila continued to take Vicodin regularly.

In 2005, Simila was prescribed physical therapy by doctors at the Pain Clinic of Northwestern Wisconsin, although he stated that he was not interested in long-term therapy. A month later the Pain Clinic discharged Simila because a toxicology screen showed evidence of cocaine. Until that time, the Pain Clinic had been pro-

viding Simila his Vicodin. After his discharge, Simila called the Midelfort Clinic and requested that they prescribe him Vicodin, explaining that "due to financial reasons," he could no longer get it from the Pain Clinic. Simila received a prescription for a refill.

**B. Psychological Evaluation**

At the request of Simila's attorney, Dr. Paul Caillier psychologically examined Simila in February 2006. Dr. Caillier reviewed Simila's medical records and conducted an in-person evaluation, which included Simila completing a Minnesota Multiphasic Personality Inventory ("MMPI-2"). Dr. Caillier wrote a letter to Simila's attorney, dated March 1, 2006, in which he concluded that Simila had chronic pain syndrome and a somatoform conversion disorder (a mental condition that causes a person to experience physical symptoms of a purely psychological origin).

Dr. Caillier talked with Simila about his symptoms and medical history. Dr. Caillier noted that Simila's mood was normal and he had "adequate attention and concentration to the task at hand." Simila described his symptoms in "dramatic fashion," explaining that his pain kept him from functioning and that Vicodin helped only minimally. Dr. Caillier noted Simila's other doctors could not explain his pain and that Simila was concerned about whether his children would develop his symptoms, which Dr. Caillier wrote "was typical of Mr. Simila's dramatic presentation." In addition, Dr. Caillier interpreted Simila's MMPI-2 results and found they

revealed a "classical conversion V pattern," which meant that Simila converted stress and anxiety into physical pain.

From his observations and the test results, Dr. Caillier concluded that Simila's somatoform disorder and chronic pain limited his functioning. Dr. Caillier completed a "Psychiatric Review Technique" (a standard Social Security disability form), and on it, he noted that Simila had "marked" restrictions of daily living activities; "moderate" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "one or two" episodes of decompensation (an acute deterioration of a person's mental health) of extended duration. From these findings, Dr. Caillier concluded that Simila's mental impairments met the requirements of Listing 12.07, Somatoform Disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1, which would classify Simila as "disabled" for Social Security purposes. In the end, Dr. Caillier recommended that Simila take anti-depressant medications and receive counseling. Simila had not sought counseling by the time of the hearing and the record does not reveal whether Simila took anti-depressants.

**C. Simila's Testimony**

Simila testified at a hearing before the ALJ on April 11, 2006. He described his prior employment as a construction laborer and how he worked as a bartender once a week and carpet installer occasionally. He testified that he would do a little more carpet installation work when construction was slow.

Simila talked mostly about his pain, though—how it affected his life and what he was able to do despite it. He testified that he felt constant pain in his joints, shoulders, elbows, neck, knees, ankles, and hips. His daily routine was limited and he barely got off the couch. He testified that he takes his children to school in the morning but upon return must take Vicodin and lie down for a few hours. (He testified that he often has to lie down if he stands or sits too long.) However, he is able to drive, pick up a gallon of milk from the grocery, and run the vacuum; he usually makes dinner for his family.

Simila also testified that any physical activity exacerbates his pain; he will "pay for it the next day." He testified that he cannot shovel snow or do car maintenance. But he does engage in some physical and recreational activities. He occasionally helps friends with various projects, such as the time he peeled logs and constructed a log home or when he helped clean a motorboat engine. However, he testified that, when building the log home, he was on Prednisone and feeling much better. (He also testified that his son did most of the log-home-building work; his sons would have been ages eleven and six at the time.) In addition, he attends his children's traveling hockey team games. He testified that he can stand for only twelve minutes (one period of hockey) and must sit between periods and sometimes during periods.

Simila also enjoys fishing and hunting. When he hunts, though, he testified that he can walk only about 400 yards into the woods before he has to sit down, and

he can stay seated for only about four hours. He went ice fishing in the winter prior to the hearing but testified that he did little work and sat in his truck most of the time. He also went fishing two weeks before the hearing. He testified that the arm with which he cast and jigged his bait was "pretty much useless" the following day.

Finally, Simila testified that he still takes Vicodin regularly, and after physical activity, he sometimes "overeats" his narcotic pain medication. He testified that he has not been to any psychological counseling, but if Dr. Caillier recommended it, he would go.

## D. Medical Expert's Testimony

Dr. Andrew Steiner, a doctor of physical medicine and rehabilitation, reviewed Simila's medical records and testified that, in his opinion, there was a lack of objective evidence that Simila was disabled. Dr. Steiner testified that the evidence showed "mild degenerative disk disease changes" in the lumbar part of Simila's back and "mild osteoarthritic changes" in his neck. He also found that Simila had some degree of hearing loss in high-frequency situations. However, he found no evidence of any significant joint deformities, loss of range of motion, or gout.

Based on these findings, Dr. Steiner concluded that Simila could perform "light work," which translates to jobs that require lifting up to twenty pounds occasionally and ten frequently; standing and walking for up to six hours; and sitting for up to two. Further, Dr. Steiner

opined that Simila should be precluded from jobs involving hazardous machinery or unprotected heights due to his hearing loss. Dr. Steiner specified that his opinion concerned only Simila's physical condition and not any psychological disorders.

### E. Vocational Expert's Testimony

Finally, the ALJ asked William Villa, a vocational expert, several hypothetical questions to determine whether there were any jobs that Simila could perform given his limitations. The ALJ first described a hypothetical in which Simila was limited to light, unskilled work that did not involve hazardous machinery or heights. She described Simila as having the following ailments: myofascial pain or musculoskeletal pain disorder, mild degenerative changes in the lumbar and cervical spine, intermittent gout, headaches, high-frequency hearing loss, chronic pain syndrome, and somatoform disorder. Based on this hypothetical, Villa concluded that Simila could perform a significant number of jobs in the national economy. The ALJ then limited the hypothetical to "sedentary work" only, and Villa still concluded that there were a significant number of jobs that Simila could perform. Finally, when the ALJ altered the hypothetical to describe a person who was unable to show up regularly for work, Villa concluded that there would not be any jobs available.

**F. The ALJ's Opinion**

The ALJ evaluated Simila's claim for disability under the mandatory five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520(a)(4) (DIB), 416.920(a)(4) (SSI). The five-step analysis requires the ALJ to examine:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (first and second alterations in original). To determine whether the claimant is able to perform his past work or is capable of performing other work (steps four and five), the ALJ assesses the claimant's residual functioning capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 404.1560(b)-(c), 416.920(e), 416.960(b)-(c). A claimant's RFC is "the most [the claimant] can still do despite [his] limitations," and the ALJ determines a claimant's RFC based on all the claimant's impairments and all the relevant evidence in the record. *Id.* §§ 404.1545(a), 416.945(a).

At step one, the ALJ found that Simila had not engaged in substantially gainful activity after the alleged onset of disability. The ALJ deemed Simila's temporary employment in the summer of 2003 an "unsuccessful work attempt" and not fatal to his claim. At

step two, the ALJ found that Simila had multiple severe impairments due to musculoskeletal or myofascial pain, mild degenerative disk disease, headaches, high-frequency hearing loss, chronic pain syndrome, and somatoform disorder. At step three, the ALJ concluded that none of Simila's impairments, physical or psychological, met or medically equaled any of the listed impairments. Then, the ALJ found that Simila had an RFC of "light, unskilled work" based on the objective medical evidence, Simila's course of treatment, his daily activities, his work history, and the medical expert's opinion. Accordingly, at step four, the ALJ concluded that Simila could not perform his past work as a construction laborer. However, at step five, the ALJ accepted the vocational expert's testimony, concluded that there were a substantial number of jobs in the national economy that Simila could perform, and ultimately found that Simila was not disabled.

### G. Simila's Appeals

Simila took his case to the Appeals Council and submitted additional evidence in the form of a letter from Dr. Caillier to Simila's attorney, dated June 22, 2006. In that letter, Dr. Caillier elaborated on his previous report and responded to the ALJ's concerns regarding the severity of Simila's mental disorders. The Appeals Council denied Simila's appeal and therefore made the ALJ's opinion the final decision of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Simila then filed suit in the district court, which affirmed the ALJ's decision and ruled that Dr. Caillier's June 22 letter

was not "new" and "material" evidence and therefore should not be included as part of the record for judicial review. *Simila v. Astrue*, No. 07-C-0029-C, 2007 WL 5490605 (W.D. Wis. Oct. 1, 2007). Simila then appealed to this court.

## II. Discussion

We review the ALJ's decision directly, but we play an "extremely limited" role. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). We will not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Id.* Instead, we look to whether the ALJ built an "accurate and logical bridge" from the evidence to her conclusion that the claimant is not disabled. *Craft*, 539 F.3d at 673. We will affirm the ALJ's decision if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). Therefore, "even if 'reasonable minds could differ concerning whether [Simila] is disabled,'" we affirm if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

Simila raises four points on appeal. He argues that (1) the ALJ erroneously rejected Dr. Caillier's conclusions about the intensity of Simila's somatoform disorder and chronic pain syndrome; (2) the ALJ erred in evaluating Simila's credibility; (3) the ALJ's hypothetical question to the vocational expert omitted key facts; and (4) the

district court should have remanded because Dr. Caillier's June 22, 2006 letter was new and material evidence.

### A.  The ALJ's Decision to Discount Dr. Caillier's Letter of March 1, 2006

Simila first argues that the ALJ erroneously declined to place significant weight on Dr. Caillier's findings regarding the intensity of Simila's impairments. The ALJ did not challenge the underlying diagnoses that Simila had a somatoform disorder and chronic pain syndrome. Rather, she discounted Dr. Caillier's conclusions concerning the degree of functional limitation that Simila's ailments cause, because they were "not supported by the objective evidence of record and [were] inconsistent with claimant's testimony." The ALJ instead concluded that Simila's disorders resulted in only *mild* restrictions of activities of daily living; *mild* difficulties maintaining social functioning; *moderate* difficulties maintaining concentration, persistence, and pace; and *zero* episodes of decompensation. Consequently, at step three in the sequential analysis, the ALJ found that Simila's impairments did not meet or equal a "Listing Level," which would have automatically declared Simila disabled, 20 C.F.R. § 404.1520(a)(4)(iii), and at steps four and five, the ALJ found that Simila had an RFC for light, unskilled work, *id.* § 404.1520(a)(4)(iv)-(v).

Before we evaluate whether the ALJ properly weighed Dr. Caillier's conclusions, we must first determine what type of "medical source" Dr. Caillier is. If Dr. Caillier

is deemed a "treating source," then the regulations require that the ALJ give his opinions controlling weight, as long as they were supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). If Dr. Caillier is a "nontreating source," however, the ALJ was not required to assign his opinion controlling weight. *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Instead, the ALJ was permitted to evaluate the opinion's weight in light of other factors. *See* 20 C.F.R. § 404.1527(d)(2)-(6); *Elder*, 529 F.3d at 415.

A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Dr. Caillier falls squarely within this definition. He examined Simila only once, and nothing in the record suggests anything "ongoing" about their treatment relationship. Furthermore, the regulations specifically define a nontreating source as any doctor with whom the claimant's relationship was "not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." *Id.* Dr. Caillier evaluated Simila at the behest of Simila's attorney, evidenced by the fact that Dr. Caillier's "report" was in fact a letter addressed to the attorney and not to Simila. Accordingly, Dr. Caillier's opinions were not entitled to controlling weight.

Simila attacks the ALJ's decision to discount Dr. Caillier's conclusions on a number of grounds. Primarily, Simila

contends that the ALJ improperly rejected the opinion of the only psychologist in the case, which left the ALJ without an adequate basis to assess the effect of Simila's somatoform disorder. In this sense, Simila argues that the ALJ "played doctor," because she had no other psychological expert opinion in which to ground her findings. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). We find Simila's view of the ALJ's role in evaluating psychological evidence too narrow. Although another psychologist's opinion would have augmented the ALJ's analysis, neither the regulations nor our prior decisions require the ALJ to rely on such specific evidence to rebut a nontreating physician. "[T]he administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—*which need not itself be medical in nature . . . ."* *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (emphasis added). Instead, an ALJ is required to determine the weight a nontreating physician's opinion deserves by examining how well Dr. Caillier supported and explained his opinion, whether his opinion is consistent with the record, whether Dr. Caillier is a specialist in pain disorders, and any other factor of which the ALJ is aware. 20 C.F.R. § 404.1527(d)(3)-(6).

This is precisely what the ALJ did here, declining to give Dr. Caillier's opinion substantial weight because it lacked consistency and supportability. The ALJ noted that Dr. Caillier found that Simila had marked restrictions of daily living activities. But she concluded that this was inconsistent with Simila's testimony that he regularly took his children to school, often made dinner

for his family, went hunting and fishing with friends and family, attended his son's traveling hockey team games, and worked with friends on side-projects. Dr. Caillier discussed none of these activities in his March 1 letter, despite the fact that Dr. Caillier appeared to base his conclusions concerning Simila's functional limitations on Simila's subjective complaints (Dr. Caillier did not claim that the MMPI-2 results—the only arguably objective measurement Dr. Caillier took—revealed the *intensity* of Simila's mental disorder). Furthermore, the ALJ discounted Dr. Caillier's opinion as to Simila's social functioning because it, too, was unsupported by and inconsistent with the evidence. Nothing in the record (or in Dr. Caillier's letter) suggests that Simila had problems getting along with his family or friends or with the crowds at hockey games. Instead, the ALJ pointed out that, throughout his medical treatment, Simila's doctors consistently described him as "pleasant" and "enjoyable."

The ALJ also found little support for Dr. Caillier's conclusions that Simila had marked difficulties maintaining concentration, persistence, or pace, and had experienced one or two episodes of decompensation. Dr. Caillier's letter mentioned Simila's capacity for concentration only once, in which he noted that Simila had "adequate attention and concentration to the task at hand." This was consistent with what Dr. Chukwudelunzu observed several years earlier when he found that Simila "demonstrate[d] adequate . . . concentration and memory during history and neurologic examination." Simila argues that this does not prove that Simila can

maintain attention and concentration throughout the workday. But Simila's argument misses the point. In determining what weight to give a nontreating physician's opinion, the ALJ is required to look for support. *Id.* § 404.1527(d)(3). Although these observations may not prove whether Simila can concentrate on full-time work, they certainly do not support Dr. Caillier's opinion that Simila is markedly deficient in that area.

Simila also attacks the ALJ's finding that Dr. Caillier did not perform a "mental status exam," citing the fact that Dr. Caillier prefaced his observations with the words "on exam." Whether these two words prove the ALJ incorrect, we cannot say. Those two words don't tell us much about what kind of exam Dr. Caillier was performing. Nonetheless, any error here was harmless given the other reasons the ALJ cited for discounting Dr. Caillier's opinions. We agree with the ALJ that Simila's hunting and fishing, attending travel hockey games, and helping friends with maintenance and construction projects are inconsistent with Dr. Caillier's conclusions about Simila's functional limitations.

Simila presents a barrage of other arguments, but to no avail. Simila contends that the ALJ ignored objective evidence supporting Dr. Caillier's opinions, such as the MMPI-2 results, Dr. Michet's note about Simila needing chronic pain rehab, and Dr. Steiner's testimony that it is not unusual for doctors treating a person with somatoform to not find any physical causes. But the ALJ did discuss the MMPI-2, and as we mentioned, the results of that test said nothing about the intensity of

Simila's pain, but only that Simila had a somatoform disorder, which the ALJ accepted as true. Moreover, the ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions. *Craft*, 539 F.3d at 673. Although snippets of Dr. Michet's notes and Dr. Steiner's testimony might support Dr. Caillier's opinions, other objective evidence is inconsistent with it: Many of Simila's medical records state that Simila had a normal, *pain-free* range of motion and normal strength, and Dr. Kent wrote that it was "unclear to me why [Simila] is totally disabled" and he saw "no reason he couldn't perform clerical work."

Simila also argues that the ALJ erred by failing to mention that Dr. Caillier is a neuropsychologist whose opinions deserve more weight. *See* 20 C.F.R. § 404.1527(d)(5). But the regulations state that a specialist's opinion is *generally* entitled to more weight; it is not presumptively so (unlike treating physicians). *Id.* (emphasis added). Mentioning Dr. Caillier's specialty might have made the ALJ's opinion more complete, but in light of the other evidence the ALJ cited, it would not have changed the outcome.

Finally, Simila argues that the ALJ erred by not seeking additional evidence before rendering a decision. *See id.* § 404.1527(c)(3). "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett*, 381 F.3d at 669. Simila relies on *Barnett* to contend that the ALJ was required to recontact Dr.

Caillier because she found his opinion unsupported by the record. Simila reads *Barnett* too broadly. An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings. *See* 20 C.F.R. § 404.1527(d)(3). And she need not recontact the source every time she undertakes such an evaluation, but only if, as we said in *Barnett*, "the medical support is not *readily discernable*." 381 F.3d at 669 (emphasis added); *see also Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007) ("ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability . . . ."). Here, the ALJ discerned and discussed the evidence upon which Dr. Caillier relied: the MMPI-2 results, his review of Simila's medical records, and Simila's subjective complaints. This record was not "inadequate." The ALJ simply found that this evidence failed to support Dr. Caillier's conclusions, a finding the regulations entitled her to make.

In one instance, though, the ALJ should have recontacted Dr. Caillier. The ALJ observed that "[I]t is unclear whether Dr. Caillier had access to the records indicating some concern with claimant's narcotic usage." We agree with Simila that "unclear" is tantamount to "not readily discernable." However, we believe the ALJ's error did not affect the outcome. And, again, the ALJ need not mention every strand of evidence in her decision but only enough to build an "accurate and logical bridge" from evidence to conclusion. *Craft*, 539 F.3d at 673. The ALJ's discussion of the lack of consistency and support for Dr. Caillier's opinion built that bridge. Ac-

cordingly, the ALJ's decision to discount that opinion was supported by substantial evidence.

## B. The ALJ's Credibility Determination

Simila next disputes the ALJ's finding that his testimony was "not entirely credible." We review an ALJ's credibility determination with deference, for an ALJ, not a reviewing court, is in the best position to evaluate credibility. *Craft*, 539 F.3d at 678. We reverse that determination only if it is so lacking in explanation or support that we find it "patently wrong." *Elder*, 529 F.3d at 413-14 (quotation omitted). An ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (quotation omitted); *see also* 20 C.F.R. § 404.1529(c)(2). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. In other words, the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and "functional limitations." *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted). In the end, "[a]n ALJ may disregard a claimant's assertions of pain if he validly finds her incredible." *Prochaska*, 454 F.3d at 738.

Simila argues that the ALJ improperly discounted his testimony as to the intensity of his symptoms and the limitations that stem from them. Relying primarily on our opinion in *Carradine*, 360 F.3d at 754-56, Simila contends that the ALJ ignored the psychological nature of his illness, relied too heavily on objective medical evidence, mischaracterized Simila's past medical treatment, and incorrectly found his current activities inconsistent with his subjective complaints of pain. Along these lines, Simila also contends that the ALJ selectively considered the evidence, looking only to which types of activities Simila performed but not to how he performed them or to activities he could no longer perform.

Though the ALJ's credibility determination was not flawless, it was far from "patently wrong." The ALJ had plenty of reason to doubt Simila's description of his symptoms and the extent of the constraints they impose. To begin with, Simila's case is not quite *Carradine*. In *Carradine*, we reversed an ALJ's finding of no disability where the ALJ failed to appreciate the psychological nature of the claimant's somatoform disorder and relied primarily on the lack of objective medical data to support his conclusions. 360 F.3d at 754-55. The ALJ in that case concluded that the claimant's somatoform disorder "implies she exaggerates the severity of symptoms she reports." *Id.* at 754. That's wrong. That the claimant has a somatoform disorder means merely that the pain has a psychological cause rather than a physical one. *Id.*

Here, the ALJ didn't make such a mistake. Instead, the ALJ had a host of facts upon which to base her opinion that Simila overstated his symptoms. Chief among them was evidence of Simila's activities. Simila helped a friend peel logs and build a log home; he replaced a gas tank; he attended his son's traveling hockey team tournaments; he went hunting and fishing (including ice fishing in the winter and fishing from a boat just weeks before the hearing). These are not light tasks. They require extended physical exertion, which Simila was seemingly able to perform. We disagree with Simila's contention that these activities are akin to the occasional driving, shopping, housework, and therapeutic walking discussed in *Carradine*. *Id.* at 755-56.

Simila argues that the ALJ failed to follow SSR 96-7p by "selectively considering the evidence" and not discussing *how* Simila engaged in these activities. But the ALJ specifically noted Simila's testimony regarding the length of time Simila spent doing each activity and that such activities "exacerbate his pain." The ALJ merely discounted Simila's credibility as to how much this pain limited his functioning—Simila's continuing to hunt, fish, and go to hockey tournaments led the ALJ to conclude that Simila can adequately deal with any increase in his symptoms. Moreover, Simila's attempts to downplay his activities contradict several of his doctors' reports and, in some instances, common sense. The reports reflect Simila's ongoing participation in certain activities (e.g., "the patient enjoys hunting, fishing, and four wheeling and playing hockey") as opposed to one or two discrete events. And, as we've already men-

tioned, one physician, Dr. Kent, openly questioned Simila's claims for disability ("I see no reason he couldn't perform clerical work, etc."). Even Dr. Caillier noted Simila's tendency to describe his symptoms in "dramatic fashion." Moreover, Simila's description of how he engaged in certain activities is equally dubious: When asked about peeling logs and building the log home, Simila didn't point to the prednisone injections and say he felt good enough to work. Instead, he responded, "my son was doing most of the work. . . . I was there along with him." Simila's sons were eleven and six years old at the time. Though we don't doubt their strength, peeling logs (which often requires using a chainsaw) might make even Paul Bunyan a little tired.

In addition, the ALJ discussed the utter lack of objective medical evidence that might bolster Simila's complaints of severe, disabling pain. Doctors consistently reported that Simila had a normal, pain-free range of motion in his limbs and spine, mostly normal strength, and only mild degenerative disk disease in part of the spine. One physician even noted that Simila exhibited some "give-away weakness," which can be a sign that the patient is trying to deceive his physician by feigning true muscle weakness. *See* LEZAK ET AL., *supra*, at 326; Hans E. Neville et al., *Neuromuscular Diseases*, *in* NEUROLOGY FOR THE NON-NEUROLOGIST 324 (William J. Weiner & Christopher G. Goetz eds., 5th ed. 2004) ("[A] 'give-away' pattern of weakness . . . suggests lack of full voluntary effort."); Leonard N. Green, *Malingering, Dissimulation and Conversion—Hysteria*, *in* TRAUMA 43-6-8[3] (Matthew Bender & Co. 2003) ("Because the deceptive patient is unaware or

uncertain as to how much strength to exert and is not exerting maximal strength as he or she is asked to do, the resulting effort produces a ratchety, irregular, sudden 'give-away' feeling to the examiner's counteraction. By contrast, the examiner finds a smooth loss of muscle resistance in a truly weakened limb."); *cf.* LEE R. RUSS ET AL., 8 ATTORNEYS MEDICAL ADVISOR § 74:80 (reissued ed. 2005) (noting that "[e]xaminers sometimes employ a 'give away weakness' test to demonstrate that a patient is faking muscle weakness," but expressing some doubt as to applicability of test to patients with Reflex Sympathetic Dystrophy/Complex Regional Pain Syndrome). All this is on top of the fact that a set of government medical examiners concluded that Simila could carry or lift over 20 pounds occasionally and over 10 pounds frequently. In short, Simila's medical history offers little or no for support his testimony.

Simila attacks the ALJ's reliance on this lack of objective evidence in light of our holding in *Carradine*. In *Carradine*, the ALJ plainly misunderstood the psychological nature of the claimant's illness and his heavy reliance on the lack of an objective medical explanation for the claimant's pain contributed to that error. 360 F.3d at 755. But *Carradine* does not imply that an ALJ can *never* consider the lack of objective evidence in rejecting a claimant's subjective complaints. Such a reading would nullify 20 C.F.R. § 404.1529(c)(2) and (4), which require an ALJ to consider the objective medical evidence. Instead, *Carradine*, consistent with the regulations, stands for the proposition that an ALJ cannot deny disability "*solely* because the available objective medical evidence

does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2) (emphasis added). Here, the ALJ considered the objective evidence along with a host of other factors named in the regulations, *see id.* § 404.1529(c)(2)-(4), like Simila's activity levels, as we've discussed.

The ALJ also evaluated Simila's course of treatment and employment history. She found Simila's treatment—various pain medications, several injections, and one physical therapy session—to be "relatively conservative" and inconsistent with Simila's complaints. Simila assails the ALJ for "playing doctor" and improperly evaluating the extent of his treatment. Simila again likens his case to *Carradine*, in which we observed that the claimant's extensive treatment regimen actually bolstered her credibility. 360 F.3d at 755. However, the regulations expressly permit the ALJ to consider a claimant's treatment history. 20 C.F.R. § 404.1529(c)(3)(v). Given the deference we show to an ALJ's factual determinations, *Craft*, 539 F.3d at 673, we will not question the ALJ's finding that Simila's treatment was "relatively conservative," especially when compared with Carradine's treatment that included morphine and a surgical implant in her spine. *See Carradine*, 360 F.3d at 755.

Moreover, Simila seemed to have his own idea of what type of treatment he needed—the record shows a pattern of drug-seeking behavior. Multiple physicians throughout the course of his treatment noted that Simila was overusing his pain medication and that such overuse might actually be causing some of his symptoms (e.g.,

"superimposed narcotic-induced headache"). Even Simila admitted that he occasionally "overeats" his pain pills. In addition, Simila has a history of cocaine use, and in 2005, the Pain Clinic of Northwestern Wisconsin discharged Simila after a toxicology screening showed evidence of cocaine. This cut off his supply of Vicodin. But Simila had to have it. So he called the Midelfort Clinic for a refill and lied, telling them he couldn't get a prescription from the Pain Clinic for "financial reasons." Though Simila was successful in getting more pills, this is hardly the kind of conduct that helps one succeed on a disability claim.

Not only was Simila all too eager to take his narcotic pain medication, which his doctors cautioned against overusing, but he was rather unwilling to participate in physical therapy, which his doctors prescribed—twice. Simila never showed up after his first session. When his doctors recommended physical therapy again, he said he wasn't interested. Furthermore, despite the fact that Simila learned that the source of his pain was psychological and despite Dr. Caillier's recommendation for therapy, Simila hadn't sought counseling by the time of the hearing. So again we see a lack of sincerity that explains the ALJ's doubting Simila's testimony.

Finally, the ALJ found that Simila's work history also undermined his credibility. Simila contests this point, arguing that the ALJ misinterpreted his employment records. Simila is correct that the ALJ erred when she stated that Simila's earnings declined from 1997 until 2003. In fact, they declined until only 2001, then rose

slightly in 2002, and declined again in 2003. But this minor mistake was harmless. In 1996, Simila's earnings were $36,980.50 and by 2001 were $10,682.29. They rose to only $15,909.67 in 2002, less than half of what they were in 1996. Although Simila testified that he bartended once a week and occasionally installed carpet, the ALJ found that Simila's declining earnings prior to the onset of his alleged disability, coupled with the fact that Simila did not participate in a vocational rehabilitation program, showed a lack of effort to find work and, under § 404.1529(c)(3), diminished his credibility. Such a finding was not improper.

Accordingly, we conclude that the ALJ properly considered both Simila's subjective complaints and evidence undermining the credibility of those complaints. She based her determination on multiple factors and the entire case record, as the regulations require. The only evidence supporting Simila's characterization of his symptoms was Dr. Caillier's assessment on the "Psychiatric Review Technique," which, as we have already held, the ALJ properly discounted. The objective medical evidence, Simila's activity levels, his course of treatment, his drug-seeking behavior, and his employment history all counsel a healthy skepticism for Simila's testimony. As such, we cannot conclude that the ALJ's credibility determination was "patently wrong."

## C. The ALJ's Hypothetical Questions for the Vocational Expert

Simila also challenges the ALJ's conclusion at step five of the sequential analysis that there were a significant

number of jobs that he could perform. At step five, the ALJ evaluates the claimant's RFC along with his age, education, and work experience, to determine whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). To make this finding, ALJs often rely on the testimony of a vocational expert ("VE"). Commonly, the ALJ will pose a series of hypothetical questions that describe the claimant's conditions and limitations, and the VE will testify to the number of jobs that the claimant can perform based on those limitations.

This is what the ALJ and VE did here. But Simila argues that the VE's conclusions were faulty because the ALJ's hypothetical questions were incomplete. Ordinarily, an ALJ's hypothetical questions to a VE "must include all limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Simila contends that the ALJ omitted several limitations that were supported by medical evidence. Most salient to our analysis here, Simila argues, is the ALJ's finding that Simila had "moderate difficulties with concentration, persistence, and pace." In addition, Simila argues that the ALJ should have included the allegations that Simila could stand or sit for only a short time, that he often needed to lie down and would miss work frequently, and that he in fact had marked difficulties with concentration, persistence, and pace.

We disagree with Simila regarding the latter set of limitations, because "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt*, 496 F.3d at 846.

The ALJ made clear that she did not find Simila's symptoms to be as acute as either Dr. Caillier's letter suggested or Simila testified. She specifically disagreed with Dr. Caillier's assessment that Simila had "marked" restrictions of concentration, persistence, and pace, and she found that Simila was able to stand for up to six hours and sit up to two. Because we found that the ALJ was justified in discounting Dr. Caillier's conclusions and Simila's credibility, we also find that she was not required to include these limitations in her hypotheticals.

The omission of the first set of limitations—Simila's moderate difficulties with concentration, persistence, and pace—is more troubling. The ALJ found these limitations to be credible, and under the ordinary rule, they would have to be included. An exception to this rule comes into play when the record indicates that the VE "independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Steele*, 290 F.3d at 942. However, the exception does not apply if the record indicates that the VE's testimony was confined to the limitations set forth in the ALJ's hypothetical question. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004).

Here, the hearing transcript indicates that the VE reviewed the record prior to testifying, and at oral argument, Simila's attorney conceded that the VE was present throughout the hearing and thus heard Simila's testimony. But the record does not indicate that the VE based his conclusions on anything other than the ALJ's

hypotheticals. Like the ALJ in *Young*, the ALJ here posed a "series of hypothetical questions with increasingly debilitating limitations" and laid out specifically the facts upon which the VE was to base his conclusions. *See Young*, 362 F.3d at 1003. The VE then prefaced his first comments with, "Given the elements of the hypothetical . . ." In none of his responses did the VE rely on or even mention his review of the record or Simila's testimony. Instead, he focused his testimony on the ALJ's hypotheticals, and accordingly, we cannot assume that the VE based his testimony on anything but those hypotheticals. Our review is thus confined to the questions the ALJ posed and whether those questions incorporated Simila's moderate difficulties with concentration, persistence, and pace.

We find that the ALJ adequately accounted for Simila's impairments. In her first hypothetical, the ALJ described all of Simila's credible impairments, physical and mental, including Simila's chronic pain and somatoform. She then stated that "because of the allegations of pain, I would also further limit it to unskilled," as well as limiting the second hypothetical to "sedentary level work." We have held that claimants who "often experience[ ] deficiencies of concentration, persistence, or pace" are capable of performing semiskilled work, *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003), and those who are "mildly to moderately limited in these areas," are able to perform "simple and repetitive light work," *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002). Simila's moderate difficulties with concentration, persistence, and pace stemmed from his chronic pain syndrome and

somatoform disorder, which the ALJ included in the hypothetical. These impairments are rooted in Simila's allegations of pain. Consequently, by limiting the hypothetical to unskilled work, the ALJ incorporated all of Simila's credible limitations.

### D.  Dr. Caillier's Letter of June 22, 2006

Finally, Simila argues that the district court should have remanded because Dr. Caillier's June 22 letter constituted "new and material" evidence. A district court may order that additional evidence be taken before the Commissioner upon a showing that there is "new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). "New" evidence is that which is "not in existence or available to the claimant at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Further, "[n]ew evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). We review the district court's decision not to remand on these grounds de novo. *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999).

Simila argues that the June 22 letter was new and material, because it was an immediate response to the ALJ's concerns about Dr. Caillier's original report. Simila roots this argument in his belief that the ALJ should have recontacted Dr. Caillier to clarify his report. The June 22

letter thus provided the necessary, though unsolicited, clarification. Hence, Simila argues that the letter is "new" because it did not exist prior to the ALJ's decision and is "material" because it contradicts the ALJ's prior interpretation.

But our prior decisions teach that the June 22 letter was hardly "new" for § 405(g) purposes. *E.g.*, *Perkins*, 107 F.3d at 1296; *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). Instead, the letter was merely "derivative evidence," because Dr. Caillier "based his conclusions entirely on evidence that had long been available." *Perkins*, 107 F.3d at 1296. Dr. Caillier did not reexamine Simila or conduct new psychological tests; rather he elaborated on his previous report and responded to Simila's attorney's questions about the ALJ's concerns. This was precisely the scenario we addressed in *Perkins*:

> [A] critique of the ALJ's opinion, which obviously could not have been done before the opinion issued, does not amount to good cause; such a rule would amount to automatic permission to supplement records with new evidence after the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process.

*Id.*

Section 405(g) does not provide occasion for a physician to submit an unsolicited clarification of his prior opinion. The ALJ has mechanisms to procure additional evidence, including recontacting medical sources, if the evidence was inadequate to reach a decision. *See* 20

C.F.R. §§ 404.1512(e); 404.1527(c)(3). Because the evidence was adequate, however, the ALJ need not have invoked those procedures here.

### III.  Conclusion

We AFFIRM the judgment of the district court.