Jody Lynn JENSEN, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner for Social Security, Defendant.

Case No. 14–C–1357

United States District Court, E.D. Wisconsin.

Signed February 23, 2016

Thomas A. Schuessler, Quincey Becker Schuessler & Chase SC, Mayville, WI, for Plaintiff.

Social Security Administration, Brian E. Pawlak, United States Department of Justice, Milwaukee, WI, for Defendant.

## DECISION AND ORDER FOR REVERSAL AND REMAND

William C. Griesbach, Chief Judge, United States District Court

Plaintiff Jody Lynn Jensen seeks review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). For the reasons that follow, the Commissioner's decision will be reversed and remanded pursuant to § 405(g) (sentence four).

## I. BACKGROUND

Plaintiff filed her application for benefits in October 2011, alleging an onset of disability date of October 1, 2009, at which time she was thirty-eight years old. Plaintiff listed the following as physical or mental conditions that limited her ability to work: debilitating migraines, neck and back pain, asthma, fibromyalgia, bulging discs in neck, right leg and foot pain, depression, endometriosis, jaw pain, left wrist tendonitis, and short-term memory loss. R. 193. After her applications were denied initially and on reconsideration,

Plaintiff requested a hearing. An Administrative Law Judge (ALJ) held a hearing in August 2013, at which Plaintiff, represented by counsel, testified.

### A. Plaintiff's Testimony

At the outset of the hearing, Plaintiff amended her onset date to September 30, 2011, so as to avoid any period of time when she was receiving unemployment benefits. R. 18. Plaintiff, who was by then forty-three years old, testified she was married with four children, the oldest three of whom were adults and the youngest age three. R. 19–20. In addition to her husband and three-year-old child, Plaintiff's twenty-year-old daughter, her daughter's ten-month-old child, and Plaintiff's mother, who had suffered a stroke, lived with her. R. 21, 33. Plaintiff testified that she completed high school and a vocational course to become a certified nursing assistant (CNA). She had last worked full-time as a CNA in 2010 and claimed that she was let go because of absenteeism due to her chronic migraine headaches. R. 22.

Plaintiff testified that it was her headaches that prevented her from working since that time. R. 24. She testified that she had a problem with headaches for most of her life. She claimed she also had "a lot of neck pain and neck problems, which also help contribute to the headaches." R. 24. As for treatment since her alleged onset date, Plaintiff testified:

> I see my doctors and they give me medication to help with my headaches. I have a device where, an electric stimulator that helps with my back and my neck in hopes of reducing pain that will eventually cause a headache. And I go to the ER a lot, for my headaches and my neck and my asthma.

R. 24. The medications prescribed for Plaintiff's headaches consisted of Vicodin

for pain, Toradol for more extreme pain, and Imitrex injections for very, very extreme pain if the other medications did not work. R 24. Plaintiff testified the Vicodin and Imitrex made her tired. Imitrex in particular put her to sleep. The Toradol made her nauseous at times and tired also. R. 31–32.

Plaintiff testified she had been on the same medications and same dosages for "a long time" and nothing had changed. The medications helped "a lot of the time," but when they did not she went to the emergency room. The number of times she went to the emergency room varied between once or twice per month and four or five times. R. 26. She testified that when she went to the emergency room she'd be given an IV but claimed she did not know what medication she was given. R 27.

At the time of the hearing, Plaintiff testified she was having four to eight severe headaches per month which required "my big medicine." R. 44. Plaintiff described the severe headaches as starting in her left eye and progressing to both eyes and her temples and across her forehead. She described the pain as piercing and throbbing, making her light sensitive and causing nausea and vomiting to the point that she would cry "ferociously." R. 43. Plaintiff claimed her severe headaches would last up to four days. R. 27. She claimed they were more frequent, almost daily, when she did not control her environment. She controlled her environment by staying at home with the air conditioner on and avoiding odors such as fresh-cut grass, campfire smoke, dish soap, laundry soap, perfumes and lotions that triggered her attacks. R. 44–45.

Plaintiff also claimed severe back and neck pain prevented her from standing or sitting for long periods of time. R. 32. She needed to sit down and take breaks even to wash the dishes. If she stood straight for a half hour, she would experience "a lot of pain in my lower back and in my upper back right below my neck and my left shoulder. I have a lot of pain there and it does get thick and swollen if I stand for a long period of time. My left shoulder tends to swell very large on top." R. 33–34. Plaintiff claimed that if she lifted anything or bent over a certain way it would pull the muscle in her neck and give her a sharp, piercing pain at the base of her neck which would lead to another headache. R. 34. As a result of her physical impairments, Plaintiff claimed she could walk with discomfort down the street about four or five driveways from her house even with sit-down breaks. She could lift dishes, but lifting her fifteen-pound grandchild caused difficulties. R. 34–35.

## B. Medical Evidence

As noted, Plaintiff's primary complaint was migraine headaches. Although Plaintiff reportedly had problems with migraine headaches since she was a teenager, the first mention of any headaches in the medical evidence is following the July 1995 motor vehicle accident when she would have been twenty-four years old. Though she reported the accident was head-on, she told a neurologist who saw her in January 1996 that she drove home and did not seek medical care at the time. The next morning, however, she reported having a severe headache. She was treated with physical therapy for mild cervical strain and TMJ, but claimed she had daily severe headaches through September 1995. R. 664. Notwithstanding the foregoing, according to the November 1995 report of her family physician, Plaintiff was hit on the driver's side by a drunk driver and had neck and back pain since. R. 305. In any event, by the time she saw the neurologist in January 1996, Plaintiff reported she was down to one-to-three bad headaches per month and was planning to sue the driver of the

truck that hit her, though a March 1996 report notes she was in a second motor vehicle accident several days ago. R. 662. The neurologist's diagnosis was post concussive syndrome. R. 664–66.

No further treatment for headaches, migraine or other, appears in the medical record until April 30, 2009, when Plaintiff presented at Family Medical Center in Green Bay, Wisconsin to establish care for migraines and asthma with Dr. Edward Bongiorno. R. 339–40. She reported that her migraines were more frequent since she had been injured in the collapse of the deck at her house the previous month. R. 316, 339. There is no medical report from any hospital relating to the deck accident in the record. In any event, Plaintiff's prescription for Vicodin, apparently from the March accident, was refilled. R. 340.

Plaintiff returned to the Family Medical Center on September 25, 2009, with a chief complaint of asthma. R. 336. Plaintiff also reported having migraines daily and was continued on Vicodin by Dr. Bongiorno. Plaintiff was directed to call the clinic later, however, and advise Dr. Bongiorno "which medication she has been on in the past for prophylactic." R. 336–37.

Plaintiff's next visit at the Family Medical Center was on November 9, 2009, for a chief complaint of flu symptoms. This time Plaintiff was seen by Dr. James Gast, who placed her on a course of prednisone for her asthma. Plaintiff also requested a refill on her Vicodin, but Dr. Gast declined her request. He told her that he would want to try other medications for her headaches first. According to the note, "she was not interested in that at this point," but could "recheck with us if things are not improving." R. 334–35.

Eleven days later, however, Plaintiff began seeing a new doctor at the Kaukauna Clinic in Kaukauna, Wisconsin, about twenty miles south of Green Bay. On November 20, 2009, Plaintiff met with Dr.

Paul Russo at the Kaukauna Clinic and explained that she was switching care from her doctor in Green Bay who had retired. Plaintiff reported she had a history of migraine headaches dating to age ten. She explained that Alprazolam or hydrocodone usually gave her the relief she needed. If not, she used injectable Imitrex. After taking a detailed history from Plaintiff, Dr. Russo refilled her Vicodin, Alprazolam, and Imitrex prescriptions. R. 434–35.

Plaintiff again saw Dr. Russo on January 7, 2010 for a pre-employment physical examination apparently required before she began her new employment as a CNA at Emerald Nursing Facility. Plaintiff reported no acute concerns or illnesses. She denied any prior back or shoulder injury, as well as any other condition that would prevent her from performing her job as a CNA. Based on his examination and the history given by Plaintiff, Dr. Russo reported "no contraindications to [Plaintiff] performing work at Emerald." R. 431.

Notwithstanding Dr. Russo's conclusion that there were no contraindications to Plaintiff performing work as a CNA at Emerald, she received a final warning for failing to come to work or even call in and explain why she was not there only three months later on March 7, 2010. R. 273. Plaintiff attributed her absence and failure to call in to a severe migraine headache. Plaintiff was finally terminated or resigned the following month after she was found asleep in her car during her shift. She testified that she dozed off after she got a headache at work and went out to her car to take her medication. R. 36.

Meanwhile, Plaintiff's last visit with the Family Medical Center was on April 1, 2010, with a chief complaint of migraines. She again saw Dr. Bongiorno. Plaintiff was fifteen weeks pregnant at the time, but explained that her Ob/Gyn was aware

that she is using Vicodin sparingly for her migraines. Her prescription was refilled, but she was told to use it sparingly. A copy of the report was sent to Plaintiff's Ob/Gyn, Dr. Allahyar Jazayeri of Women's Specialty Care, R. 331–33.

On June 30, 2010, Plaintiff telephoned the Brain, Spine & Pain Center at Bellin Health requesting a prescription for Vicodin. She stated that a neurologist at the Center told her it was okay for her to use Vicodin for her headaches. She claimed she did not have a family doctor and so her Ob/Gyn referred her to the Center for the prescription. R. 356–57.

In fact, however, the record shows that a month-and-a-half earlier, on May 18, 2010, Plaintiff was seen at the Brain, Spine & Pain Center by Dr. Brenda Dierschke upon the request of Dr. Jazayeri, for evaluation and treatment of headaches and neck pain. Plaintiff told Dr. Dierschke that she had been on Vicodin for twenty years. She reported that Dr. Jazayeri had recommended that she not take Vicodin for the sake of her baby. R. 366. After taking a detailed history, Dr. Dierschke set out a recommendation and plan that included a referral to physical therapy, a referral to neurology for evaluation and treatment recommendations for headaches, checking with Dr. Jazayeri as to what medications she could take, obtaining treatment records for the 1995 accident, and a psychological evaluation and treatment recommendation as well as an opioid evaluation. Plaintiff acknowledged that she was not to take Vicodin for the sake of her baby. R. 368.

On July 7, 2010, Plaintiff was seen at the Brain, Spine & Pain Center for a follow-up visit scheduled in response to her June 30 telephone request for a Vicodin prescription. She was twenty-eight weeks pregnant. Plaintiff claimed she was suffering from a migraine headache and needed a refill of her Vicodin prescription. At that time, she identified Dr. T. Gallagher of Aurora as her Ob/Gyn. His first consult with her had been the day before. Plaintiff claimed her last dose of Vicodin was three-and-a-half weeks earlier. A notation on the patient visit report reads "where Vicodin coming from." R. 351. Plaintiff was discharged with directions to get a list of past medications she had tried. She was told that the Center would call her later that day for an appointment with Dr. Dierschke. R. 350. There are no further records from the Brain, Spine and Pain Center, however, nor are there any records from Plaintiff's Ob/Gyns.

Instead, there is a gap in the medical record until October 11, 2010, when Plaintiff returned to see Dr. Russo at the Kaukauna Clinic for a migraine she stated had been going on intermittently for four days. The report notes that Plaintiff had her fourth C-section on September 17, 2010. Plaintiff reported to Dr. Russo that on October 9, 2010, she had gone to the emergency room (ER) at Aurora BayCare Medical Center and was given a shot of "some type of medication." R. 428. The ER record from Aurora states she was "medicated with Reglan, Toradol and Dilaudid, with resolution of her headache." She was discharged with instructions "to rest at home" and "recheck if any problems." R. 712–13. Two days later on October 11, Dr. Russo gave Plaintiff a prescription for 20 Vicodin tablets with a follow-up in two months. R. 428.

Three weeks later on November 2, 2010, Plaintiff returned to Dr. Russo with a complaint of migraine headache and chronic neck pain. The clinic note states Plaintiff had an "MRI of the c-spine which showed moderate to severe left neural foraminal stenosis at the C5–6 level, mild cord compression and an MRI of the thoracic level that showed mild degenerative changes." Dr. Russo prescribed Diclofenac for neck

and back pain and refilled Plaintiff's Vicodin prescription for 40 tablets. He also recommended a physiatry consult and a recheck in two months. R. 424–25, 466, 467.

Ten days later on November 12, 2010, Plaintiff returned to Dr. Russo with a complaint of a migraine headache that began at 3:00 a.m. that morning that had not improved with Vicodin. The clinic note states: "Here with husband. History of migraines and she has a known herniated disc in her neck. She hasn't yet seen a spine surgeon." Dr. Russo administered an injection of 60 mg of Toradol. R.421–22.

Less than two weeks later, on November 25, 2010, Plaintiff presented at the ER at St. Mary's Hospital again complaining of a generalized migraine headache. Plaintiff reported that she had a long-standing history of many years of migraines for which she usually received an injection from her physician but that his office was closed for Thanksgiving. She reported that headache had lasted eighteen hours and she had no relief from over-the-counter pain medications. The report lists Plaintiff's medications as Flovent and Albuterol, but does not mention Vicodin. Plaintiff stated that she was generally given Demerol and Vistaril for her headaches when she went to the hospital. She was given an injection of 50 mg of Demerol and 25 mg of Vistaril. R. 453.

On January 6, 2011, Plaintiff was seen by Dr. John Revord, a physiatrist at the Neuro Spine Center of Wisconsin in Appleton, for a consultative evaluation requested by Dr. Russo. Plaintiff described her previous motor vehicle accidents from the 1990s and reported that in approximately 2002 she developed "the gradual, atraumatic onset of thoracic and low back pain which is now constant." Plaintiff claimed that a deck collapse in 2008 exacerbated her cervical, thoracic and lumbar pain. R. 382. (The deck incident appears to have actually happened in 2009. R. 316.) She reported that "her current symptoms are constant cervical, thoracic, and lumbar pain which are increased by all activities except for walking or sitting in a reclined position." She rated her pain as 8 on a 10–point scale and claimed they were gradually worsening with time. R. 382.

Dr. Revord performed a physical examination which revealed some limitation of cervical range of motion, but normal muscle strength, tone and bulk in bilateral upper and lower extremities. He also reviewed an October 7, 2010, magnetic resonance imaging (MRI) of Plaintiff's cervical spine, apparently the same one Dr. Russo reviewed, and stated that it showed to his eye "moderate disc space narrowing at C5–C6 and C6–C7, with prominent osteophytosis and loss of the usual cervical lordosis." He made no mention of spinal cord compression or disc herniation. An MRI of the thoracic spine was essentially normal, but Dr. Russo had not ordered an MRI of the lumbar spine. Noting that she had previously benefitted from electrical stimulation at her chiropractor's office, Dr. Revord referred Plaintiff back to physical therapy for brief evaluation and treatment and a trial of a TENS unit to the cervical spine. He also ordered an MRI of the lumbar spine. R. 382–84, 389.

Dr. Revord followed up with Plaintiff on January 28, 2011. He noted that the MRI of her lumbar spine showed "mild disc space narrowing most prominent at L3–L4 and L4–L5." Based on the history Plaintiff provided and his examination and diagnostic testing, Dr. Revord listed final impressions of chronic lumbar and thoracic pain since 2002, likely myofascial, chronic cervical pain since 1985, moderate C5–C6 and C6–C7 disc aging, and bilateral greater occipital neuritis. He instructed Plaintiff on ice massage to the greater occipital

nerve, rescheduled a missed physical therapy appointment and warned her that she was at risk of being discharged from physical therapy due to multiple no show appointments, and offered to follow up with her if she was interested in pursuing greater occipital nerve injections. R. 385. The last record from the Neuro Spine Center is a February 3, 2011 physical therapy initial evaluation. R. 388. There is no evidence in the record that Plaintiff sought physical therapy elsewhere.

In the meantime, on January 23, 2011, Plaintiff had returned to the ER at St. Mary's Hospital in Green Bay again complaining of a migraine headache that started two days earlier. This time she was injected with Zofran and Dilaudid. She felt improved an hour after the injection and returned home. R. 451. No mention of this visit appears in Dr. Revord's follow-up report on her visit five days later. In fact, Dr. Revord's follow-up report notes that "since her last visit her symptoms have remained stable." R. 385.

On March 2, 2011, Plaintiff presented to Dr. Timothy Culligan at the Kaukauna Clinic with a severe headache that had already lasted fifteen hours. She stated she had tried Vicodin with only temporary relief and noted that in the past she has had improvement with injectable Imitrex if started early. Dr. Culligan noted the frequent refills of Vicodin in the past several weeks and discussed with Plaintiff the probable benefit of a prophylactic daily agent. He started her on Propranolol and suggested she may benefit from a neurological examination. Dr. Culligan then injected Plaintiff with Toradol which provided little benefit. She had marked improvement after 10 mg of Nubain and 25 mg of Phenergan. R. 419.

On March 19, 2011, Plaintiff presented to the ER at St. Mary's Hospital complaining of a migraine headache that came on when she was exposed to some perfume. She reported that she had tried Vicodin but it was more severe than she could handle at home. She was given an injection of Dilaudid and Vistaril, and told to follow up with a Dr. Araujo, who she presumably gave as her treating physician. R. 449. There are no records of any treatment by a Dr. Araujo.

On March 23, 2011, Plaintiff was seen by Dr. Russo at the Kaukauna Clinic for a cough and refill of her headache medication. She reported to Dr. Russo that she had not taken the Propranolol Dr. Culligan prescribed because she felt it would make her asthma worse. Dr. Russo prescribed an antibiotic for Plaintiff's cough and a trial of Imipramine to prevent migraine headaches. He also gave her a prescription for forty Vicodin tablets. R. 415–17.

On May 3, 2011, Plaintiff returned to the Kaukauna Clinic for a recheck of her chronic neck pain and migraine headaches. She reported that she stopped taking the Imipramine because she wasn't sure it was helping her migraines. Though she said she had a three-day migraine immediately after stopping, she had not restarted it. She reported she took one Vicodin in the morning daily to help prevent migraines. Dr. Russo explained that he would like to eventually get Plaintiff off of Vicodin and recommended that she restart the Imipramine. He also gave her a refill of 50 Vicodin tablets and scheduled her for a recheck in six weeks. R. 413–14.

Plaintiff returned to the Clinic a month later on June 4, 2011, complaining of a severe migraine and saw Dr. Gregory Johnson. She stated she was out of town and did not have her Vicodin available until that morning. She claimed she had taken two Vicodin that morning with no benefit. Dr. Johnson noted that he was "worried about the amount of narcotics that this patient has been prescribed." He

gave her injections of Phenergan and Nubain, but thirty minutes later she still complained of pain rating it as a 7 to 8 on the 10–point scale, down from 10. Dr. Johnson reviewed with Plaintiff preventive headache medications, such as Imipramine and Propranolol that she had been offered in the past. Dr. Johnson noted that Plaintiff indicated "neither one of them worked but did not give me a good story as to how long she specifically tried them." Plaintiff was encouraged to go home and get some rest now and if the headache was persisting, they could consider having her go to the ER for other types of IV medications. R. 409–10.

Three weeks later on June 24, 2011, Plaintiff saw Dr. Russo. She reported that she was currently taking the Imipramine and had only "two bad headaches" over the past month, compared to the usual several a week. She asked to try injectable Sumatriptan because it worked in the past and also needed a refill of her Vicodin "though she is trying to use them sparingly." Dr. Russo gave her a refill prescription for 50 Vicodin tablets. R. 406–07.

Over the next several months, Dr. Russo continued to prescribe Vicodin for Plaintiff's migraines. On July 22, 2011, Dr. Russo gave Plaintiff a prescription for another 60 Vicodin tablets, and on August 17, 2011, another 30 tablets. Less than two weeks later, on August 30, 2011, Dr. Russo gave Plaintiff a prescription for another 60 Vicodin tablets. Plaintiff reported she was using Vicodin for both migraines and chronic neck and back pain. She also stated she is supposed to get an epidural steroid injection in her neck but she had to wait until she could pay the previous bill with the neurologist. Dr. Russo gave her a prescription for Tramadol for the neck and back pain and instructed her to use the Vicodin only for migraines. R. 397–99. On September 23, Dr. Russo gave Plaintiff a prescription for another 60 tablets of Vicodin. R. 395.

On October 6, 2011, Plaintiff presented to the ER at St. Mary's Hospital stating "I have another migraine headache." She reported that her Excedrin, Vicodin and Imitrex had not helped, and as in the past, she was given injections of Dilaudid and Vistaril. Again, she was instructed to contact Dr. Araujo if she had continuing problems, even though Dr. Russo is the physician who had been treating her. R. 447.

On October 18, 2011, it appears Plaintiff again changed doctors when she presented at the Lena Primary Care Clinic at Community Memorial Hospital (CMH) in Lena, Wisconsin, some thirty miles north of Green Bay, stating that she was moving there and wanted to get established. R. 516. After taking a brief history, Dr. Isaias Cupino refilled Plaintiff's Vicodin prescription.

On October 21, 2011, Plaintiff returned to the ER at St. Mary's again complaining of a migraine headache. She was given Nubain, Toradol, Zofran, and a bolus of fluid, but she requested Dilaudid. When the doctor went back to explain to her about how rebound headaches occur with this large dose of narcotics and he would prefer not using it, she had already left the room. R. 445. That same day, Plaintiff also appeared at CMH in Lena complaining of a severe migraine headache. It is not clear from the report what treatment was provided. R. 515.

On November 11, 2011, Plaintiff appeared at CMH complaining of headaches. She reported she takes three to four Vicodin tablets a day but the relief does not last. Dr. Cupino refilled Plaintiff's Vicodin prescription and referred her to Advance Pain Management (APM) in Oconto Falls, about twenty miles north of Green Bay. On November 16, 2011, Plaintiff was seen for an initial history and physical by Dr. David

Lindley at APM. Based on the history provided and his physical examination, Dr. Lindley diagnosed cervical spondylosis, headache, and pain in limb. He ordered Point of Care Testing as routine for a patient on Medication Therapy, discontinued hydrocodone and started Plaintiff on Percocet. He also had Plaintiff sign a "narcotic agreement." R. 455–57.

Plaintiff returned to APM on December 9, 2011. Dr. Lindley noted that Plaintiff had gone to Dr. Cupino for an opioid prescription. She stated she did not know she wasn't supposed to use opioids. She had left her Percocet in another state and said that hydrocodone worked much better. Dr. Lindley scheduled "medial branch blocks at C2, C3, C4 times two." He indicated he would prescribe hydrocodone with a refill date of December 14, 2011. R. 460–61. On December 15, 2011, Dr. Lindley performed the cervical facet block procedure. R. 463–64.

On January 20, 2012, Plaintiff returned to CMH for a refill of her Vicodin prescription. R. 511. Her prescription was again refilled at CMH on February 17 and March 16, 2012. On June 1, 2012, Dr. Cupino discontinued Plaintiff's Vicodin and prescribed Oxycontin. On June 29, 2012, Plaintiff told Dr. Cupino that while the Oxycontin works on her neck and back, Vicodin worked for her migraines. At that point, Dr. Cupino issued prescriptions for refills of both Oxycontin and Vicodin. R. 508–511.

In the meantime, on April 11, 2012, Plaintiff presented at the ER at Aurora Health Care complaining of a severe migraine since 4:00 a.m. Though Plaintiff requested Dilaudid, the ER doctor prescribed Droperidol instead. The nurse explained why Droperidol had been prescribed and offered to have the doctor talk to her but she declined. R. 695. Two days later, on April 23, 2012, Plaintiff returned to the Kaukauna Clinic com-

plaining of a migraine headache and chronic neck pain. After obtaining the records from Dr. Lindley and Aurora, and reviewing medication prescriptions filled at the Oconto Falls Pharmacy, Dr. Russo continued Plaintiff on Tramadol and gave her a prescription for 120 tablets of Vicodin. R. 537–39.

On May 11, 2012, Dr. Russo saw Plaintiff for a recheck. Plaintiff reported she was using four Vicodin a day and Tramadol. Dr. Russo noted that "since we have tried weaning her off narcotics, hasn't been successful and she is stable now will continue her on Imitrex 6 mg subcutaneously at onset of migraine, repeat in 2 hours if needed, the Vicodin 1 up to four a day, Tramadol as needed, and recheck patient in one month." R.535.

On June 8, 2012, Plaintiff's condition was unchanged, and she was given refills for Tramadol and Vicodin (120 tablets). R. 531–32. Her condition was likewise unchanged at a recheck on July 6, 2012. She had gone to Aurora on July 4, 2012, and was given an injection of Toradol. She was still taking about four Vicodin a day. Dr. Russo gave her a prescription for Ketorolac and told her to try it before using Vicodin and Tramadol. He also refilled her other prescriptions, including one for 120 tablets of Vicodin. R. 528–29.

Plaintiff continued to see Dr. Russo for rechecks, follow-up appointments, and prescription refills at least every month. R. 556, 736–49. By November 8, 2012, Plaintiff was up to eight Vicodin tablets a day. R. 624–25. In December she dropped down to four per day. R. 620–23. In January, Plaintiff told Dr. Russo she was "very happy with how her headaches and neck pain are doing." R. 619. But by February 2013, she was back up to eight Vicodin per day. Dr. Russo noted that in the past he has tried to reduce Plaintiff's medication but have not been able to get

them any lower. R. 617. Dr. Russo continued to write prescriptions for 120 Vicodin tablets 10–650 mg for Plaintiff every month through May 2013. R. 611–16. Plaintiff also received a prescription from Aurora on May 28, 2013, for 30 Vicodin tablets because of pain from a chipped tooth. R. 718–19.

By June 11, 2013, Plaintiff was back seeing Dr. Cupino in Lena. R. 769. In a clinic note dated June 25, 2013, Dr. Cupino noted that Plaintiff "was doing ok on Vicodin but recently it was not effective anymore." She stated she had tried Oxycontin in the past and it was effective. Though she was seeing Dr. Russo, he did not want to prescribe Oxycontin. It was for that reason, Dr. Cupino noted, that "patient is switching here." Dr. Cupino also noted "Patient denies abusing meds although she has a tendency to overuse. Last prescription was for vicodin 10/650 # 120 filled on 6/3/13 now gone." Based on the history given by Plaintiff, Dr. Cupino prescribed 30 20mg Oxycontin tablets. R. 765. In a clinic note dated July 26, 2013, Dr. Cupino states Plaintiff reported neck pain and chronic low back pain are helped by 30 mg Oxycontin with no side effects. He indicated no sign of med abuse and Plaintiff able to do more chores and exercise. R. 754. Two-and-a-half weeks later, Plaintiff had her hearing before the ALJ.

## C. ALJ's Decision

In a written decision issued on October 13, 2013, the ALJ found that Plaintiff suffered from several severe impairments, including degenerative disc disease, a history of migraine headaches, hypertension, asthma, fibromyalgia, and depression. Despite these impairments, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b), except for the following limitations: "she is limited to occasional exposure to odors, dust, fumes, and gasses; should not be exposed to hazards, such as moving machinery or unprotected heights; no climbing ladders, ropes or scaffolds; limited to simple, routine and repetitive work tasks; and she is unable to perform work requiring public contact, but she would be able to interact occasionally with coworkers and supervisors." R. 84. With this RFC and considering her age, education and work experience, the ALJ found that Plaintiff was unable to perform any jobs she had performed in the past, but that she could perform other jobs that exist in significant numbers in the national economy. Based on these findings, the ALJ concluded that Plaintiff was not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff claims that the ALJ committed essentially six significant errors: failed to assess Plaintiff's ability to work on a function-by-function basis; failed to consider the side effects of Plaintiff's medication and treatment; failed to give controlling weight to Plaintiff's treating physician's assessment of her ability to perform work-related tasks; failed to properly assess Plaintiff's credibility in accord with Social Security Ruling (SSR) 96–7p; and failed to include all relevant limitations in her RFC. Plaintiff also challenges the ALJ's finding that she retained the ability to perform light work. Based on these errors, Plaintiff argues that the Commissioner's decision should be reversed and the case remanded for further proceedings.

## II. ANALYSIS

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir.2011). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007).

## A. RFC

One of Plaintiff's claimed error stands out in particular given recent Seventh Circuit decisions addressing the same issue. Before the Social Security Administration initially denied Plaintiff's application, Kurt A. Weber, Ph.D., performed a mental status evaluation of Plaintiff at the request of the SSA. Dr. Weber examined Plaintiff and concluded she had "moderate" limitations in the ability to maintain concentration, attention and work pace, among other things. R. 472. Based on Dr. Weber's opinion, the ALJ found Plaintiff had "moderate" difficulties with regard to concentration, persistence or pace. R. 83.

■ The ALJ found Plaintiff not disabled based on testimony from a vocational expert that a significant number of jobs exist in the national economy—including general production worker, "packing and hand packager," and assembler—that could be performed by someone with Plaintiff's limitations. R. 88–89. Specifically, the expert's opinion was that a hypothetical person who could perform work at the "light" exertional level and who was further restricted to performing "simple, routine and repetitive work tasks" could perform the occupations noted above. R. 52–53. Although Plaintiff has asserted other claims of error on the part of the ALJ, this is all the information the Court needs to conclude that reversal of the Commissioner's decision is required.

■ Under the law of this circuit, an ALJ who finds a claimant has moderate limitations in the ability to maintain concentration or pace cannot adequately account for those limitations by merely restricting the claimant to simple, routine, repetitive tasks and limited interaction

with others. As the Seventh Circuit has recently explained:

The hypothetical question begins by positing a person capable of performing "simple, routine, and repetitive tasks." These terms refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days. As Varga notes, whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—e.g., with ["moderate"] difficulties maintaining concentration, persistence, or pace—can perform such work. For this reason, we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.

*Varga v. Colvin,* 794 F.3d 809, 814 (7th Cir.2015) (internal citations and quotations omitted); *see also Yurt v. Colvin,* 758 F.3d 850, 858–59 (7th Cir.2015) ("But we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."). Although *Varga* was decided after the briefs in this case were submitted to the Court, this particular issue is not a new one. *See Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir.2009) ("The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position."). Plaintiff raised the issue in her opening brief and the Commissioner failed to provide any response, let alone an explanation

as to why the error does not require remand.

To some extent, the ALJ's error is understandable. Plaintiff testified that she had not been treated for any mental health problems, and she failed to describe any limitations caused by depression or any other mental impairment. R. 30. Moreover, this Court has expressed its own views about faulting an ALJ for not incorporating "moderate" limitations noted on the SSA's forms into the RFC assessment, given the SSA's own rulings and regulations, and the guidelines set forth in its Program Operations Manual System. *See, e.g., Pingel v. Colvin,* 156 F.Supp.3d 947, 2016 WL 235936, at *10–11 (E.D.Wis. Jan. 20, 2016). But in this case, the ALJ did not merely adopt the opinion of a non-examining consultant who had noted a moderate limitation in the "Summary Conclusions" section of the SSA's Mental RFC Assessment form or the same in the Psychiatric Review Technique form, as in *Pingel* and the cases discussed therein. Here, an examining psychologist explicitly found Plaintiff's work capacity was moderately limited in concentration and work pace, and the ALJ gave that medical opinion "significant weight" for purposes of steps four and five of the sequential evaluation process. R. 87.

Of course, the phrase "moderate difficulties" or "moderate limitations" is not self-defining. It at least means that a person with such limitations would be able to perform tasks that require persistence, concentration and pace, albeit with some level of difficulty greater than a person who does not have such limitations. Otherwise, the consultants would have stated in this case, and the ALJ would have found, that Plaintiff could not perform such tasks at all. Nevertheless, the ALJ's translation of this limitation to "simple, routine and repetitive tasks" in her hypothetical question/RFC finding is precisely what the Seventh Circuit has held improper. Based

on the law in this circuit, it appears that an ALJ who credits such a finding is to include in her RFC and the hypothetical she poses to the vocational expert the specific limitation "moderate difficulty in concentration, persistence and pace," and then leave it to the vocational expert to interpret it as he or she sees fit. In any event, until the Seventh Circuit holds otherwise, cases in which the ALJ finds moderate limitations in concentration, persistence or pace (at steps two/three or later) and merely restricts the claimant's RFC to simple, routine, repetitive tasks, will require remand unless the vocational expert has independently reviewed the record. *Varga,* 794 F.3d at 813.

The Commissioner's decision denying Plaintiff's application must therefore be reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). As noted above, Plaintiff has asserted other arguments that the ALJ committed reversible error. Given my finding that the ALJ erred in her determination of Plaintiff's RFC and in formulating the hypothetical question posed to the vocational expert, I need not address the remaining claims. *Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir.2011) ("These flaws are enough to require us to remand the case to the Agency for further proceedings. We therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding regarding Scott were so 'patently wrong' as to separately require remand."). For the sake of completeness, however, it is worth addressing Plaintiff's other claims of error.

**B. Credibility**

■ If Plaintiff's impairments were as severe as she described in her testimony and submissions, she would clearly be disabled. She reported generally that she was "unable to lift, bend, stand for any

period of time," "unable to sit for period of any time," "unable to focus, concentrate for any time frame," "unable to drive at times," "unable to make it to work because of pain," and "unable to be near any people due to scents—causing severe migraines on daily basis." R. 206. From the time she woke up, she claimed she alternated between the couch and bed. R. 207. She claimed she could lift only five to ten pounds, stand only five minutes, sit fifteen minutes and walk about a block. R. 211. In essence, she claimed she was in nearly constant disabling pain. R. 213. After careful consideration of the evidence, however, the ALJ concluded that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." R. 85. Plaintiff claims that ALJ erred in making this determination.

Assessing the credibility of a Social Security disability claimant's statements about the extent of his or her pain and limitations is often not an easy task for an ALJ. This is because, unlike most facts that factfinders are called upon to determine, the pain a claimant feels is experienced only by the claimant. Contrary to what some politicians might say, we cannot feel another person's pain. Of course, when there is an obvious injury or disease that is likely to cause severe pain, such as a severely herniated disc or bone cancer, we do not need to feel the claimant's pain to believe his statements as to its intensity, persistence or limiting effects. The medical evidence is enough almost by itself. The same is not true, however, when the intensity, persistence or limiting effects of the claimant's symptoms cannot be verified through diagnostic or laboratory tests that reveal the underlying injury or disease. That is the case with Plaintiff's impairments here.

Although an October 7, 2010, MRI of the cervical spine showed moderate disc space narrowing at C5–C6 and C6–C7, with prominent osteophytosis and loss of the usual cervical lordosis or curvature, an MRI of the thoracic was essentially normal and an MRI of the lumbar spine showed only early disc degeneration with no focal herniations. R. 382, 389. Physical examination revealed some limitation of cervical range of motion, but normal muscle strength, tone and bulk in bilateral upper and lower extremities. R. 383. There was no suggestion that surgical intervention was needed. The most that can be said from the medical evidence is that Plaintiff's impairments could reasonably be expected to produce pain or other symptoms. The question of whether Plaintiff's impairments produced symptoms having the intensity, persistence and limiting effects claimed by Plaintiff requires a determination of Plaintiff's credibility based on a consideration of the entire case file. This is the analysis the ALJ undertook here. R. 85–87.

In assessing Plaintiff's credibility, the ALJ explicitly noted her December 1995–96 motor vehicle accidents and her September 1997 arthroscopy for temporomandibular joint disorder. Given the diagnosis and treatment at the time, and because there was no evidence of ongoing treatment since the accidents, the ALJ reasonably concluded that these conditions had resolved. The ALJ also noted that in April (actually March) 2009, Plaintiff was injured when her deck collapsed and she hit her head. Finding little treatment from April 2009 through April 2010, the ALJ also concluded that this had resolved with treatment. R. 85. Dr. Russo's employment physical in January 2010 also supports the ALJ's finding. As to Plaintiff's condition after that time, however, the Commissioner may want to take a second look, and it is in part to assist her in doing so that I have set out the medical

record in such detail in chronological order above.

The ALJ, for example, concluded that the record showed Plaintiff's headaches to be "reasonably well-controlled with medication." R. 85. Random notations in the vast medical record spanning three-and-a-half years indicating that on that particular day Plaintiff was feeling better hardly shows that her headaches were well controlled. Indeed, the doctors Plaintiff saw continued to prescribe large amounts of narcotic pain medication precisely because they believed her repeated complaints that she was having severe migraine headaches lasting up to four days multiple times per month. Plaintiff's headache journal is likewise inconsistent with the finding that her headaches were under control, despite the large doses of medication she was taking. R. 557–59, 575–603. Of course, that doesn't mean the ALJ was required to believe Plaintiff's journal, her complaints to the doctors who continued to prescribe narcotics for her for more than three years, or the hospital ER staffs that gave her injections of even more powerful narcotic pain medication. But it is for the ALJ, not the court, to explain whether she believes Plaintiff's complaints and, if not, why. *See Parker v. Astrue,* 597 F.3d 920 922 (7th Cir.2010) (holding that attorney defending Commissioner's decision may not rely on evidence not mentioned by ALJ).

The ALJ also noted that Plaintiff's doctors had "expressed some concern regarding her use of narcotics" and indicated this "raises the question whether her headaches are at the severity alleged." R. 86. Plaintiff chastises the ALJ for citing only one instance of a doctor expressing such concerns, but as is clear from the detailed recounting of the medical record above, such concerns were expressed by almost every doctor that treated Plaintiff after 2009, and are also apparent from the man-

ner in which she repeatedly switched doctors and, in particular, by her efforts to obtain prescriptions for Vicodin even when she was pregnant. Plaintiff suggests that her attempts to obtain Vicodin and other narcotic pain medication is evidence of the frequency and severity of her migraines. She notes: "ALJ Waters misconstrues plaintiff's medication history. SSR 97–7p specifically states that '[p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as increasing medications ... may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.'" Pl.'s Br. in Supp. 23 (ECF No. 13).

But while it is true that frequent use of narcotic pain medication can be evidence of frequent and severe pain, it can also be evidence of a strong desire for the narcotics themselves and even addiction, and less than honest efforts to obtain such medications certainly bear on the credibility of the claimant. *Poppa v. Astrue,* 569 F.3d 1167, 1172 (10th Cir.2009) ("Contrary to Ms. Poppa's assertion that the only evidence of drug-seeking behavior is a 'single, isolated remark in the record,' ... there is sufficient evidence in the record to support the ALJ's determination that Ms. Poppa's credibility about her pain and limitations was compromised by her drug-seeking behavior."); *see also Anderson v. Shalala,* 51 F.3d 777, 780 (8th Cir.1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain"). The Seventh Circuit addressed drug-seeking behavior in the context of a claim for disability insurance benefits under the Social Security Act in *Simila v. Astrue:*

> Multiple physicians throughout the course of his treatment noted that Simila was overusing his pain medication and that such overuse might actually be

causing some of his symptoms (e.g., "superimposed narcotic-induced headache"). Even Simila admitted that he occasionally "overeats" his pain pills. In addition, Simila has a history of cocaine use, and in 2005, the Pain Clinic of Northwestern Wisconsin discharged Simila after a toxicology screening showed evidence of cocaine. This cut off his supply of Vicodin. But Simila had to have it. So he called the Midelfort Clinic for a refill and lied, telling them he couldn't get a prescription from the Pain Clinic for "financial reasons." Though Simila was successful in getting more pills, this is hardly the kind of conduct that helps one succeed on a disability claim.

573 F.3d 503, 520 (7th Cir.2009); *but see Kellems v. Astrue,* 382 Fed.Appx. 512 (7th Cir.2010) (holding that ALJ erred in finding drug-seeking behavior absent evidence that claimant sought to obtain medication by deceiving or manipulating medical professional). On remand, it would be helpful if the ALJ explains what she meant by the doctors' "concern regarding [Plaintiff's] use of narcotics" and what role it played in her analysis of Plaintiff's credibility and the severity of her impairments, if any.

In support of her credibility finding, the ALJ noted that Plaintiff left against medical advice during treatment at the ER at St. Mary's Hospital in October 2011. The ALJ also noted Plaintiff reported to medical professionals that she could prevent migraines by avoiding strong odors. R. 86. Certainly, rejecting recommended treatment without a good reason suggests that the pain caused by an impairment is neither frequent nor severe, but as Plaintiff points out, the report cited by the ALJ merely indicates that Plaintiff left the ER before the doctor could explain why he was refusing her request to give her Dilaudid. R. 445. This one incident does not show that Plaintiff rejected treatment. But the ALJ also noted that Plaintiff failed to keep her appointments for physical therapy and

there is also evidence that she discontinued prophylactic medication that was intended to prevent the onset of migraines. R. 86, 410. The ALJ is certainly free to consider this evidence, but even when there is evidence that a claimant rejected treatment, the ALJ should consider why she did so in order to rule out innocent explanations. *See Moss v. Astrue,* 555 F.3d 556, 562 (7th Cir.2009) (holding that "while infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, we have emphasized that the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care") (internal quotes omitted); *see also* SSR 96–7p, 1996 WL 374186, *7. As to Plaintiff's purported statement that she could prevent migraines by avoiding strong odors, the report cited by the ALJ merely states that one of Plaintiff's adult children and his/her spouse moved in with her and that they had some car deodorizers which caused a strong smell that seemed to exacerbate her headache. R. 615. This is not the same as saying that Plaintiff is able to avoid migraines altogether.

The ALJ also noted that if Plaintiff were as limited as she claimed, she would be essentially bedridden. R. 87. Yet her own account of her daily activities clearly shows she is not bedridden. She stated she goes to the park, shops in stores, drives and cares for her three-year-old child. The ALJ also noted she told that examining psychologist that her mother moved in with her after suffering a stroke. R. 87. Plaintiff argues that the ALJ mischaracterized the evidence as to Plaintiff's condition so as to undermine her credibility. Referencing the Function Report she submitted on July 15, 2012, Plaintiff argues she qualified the limitations by stating that her level of functioning depends

on the pain and the day and specifically noted "I can't answer this accurately because every day is different, pain varies." Pl.'s Br. in Supp. 22. But Plaintiff also submitted a Function Report on November 11, 2011, before she retained a lawyer, and no such limitations or qualifications appear. R. 206–13. Based on the limitations contained in her original Function Report, the ALJ's conclusion that Plaintiff was at least exaggerating her limitations, if not totally misrepresenting them, was certainly not unreasonable.

Plaintiff argues the ALJ erred in not considering the side effects of her medications on her ability to function. But the ALJ expressly noted that Plaintiff testified she experienced adverse side effects from her medications. The ALJ also noted, however, that the medical record indicated Plaintiff told her physicians that the side effects had been relatively mild. R. 87. The fact that Plaintiff continued seeking medication and took no steps to address the underlying conditions allegedly causing her pain, assuming alternatives existed, would support the ALJ's conclusions that the side effects of the medications were not severe. And, of course, if Plaintiff was engaged in drug seeking behavior unrelated to an underlying medical condition, the side effects are not relevant. This issue also requires further development.

Plaintiff also argues that the ALJ misused her previous work record in concluding she was not disabled. Plaintiff contends that the fact that she obtained and lost many jobs shows how hard she has tried to obtain and hold employment despite her severe migraine headaches. She cites the loss of her job at Emerald Nursing Facility in April 2010 as just another example of her commitment to work. Plaintiff points to the fact that she had six employers in 1998, five in 1999, two in 2000, two in 2001, three in 2002, two in 2003, five in 2004, three in 2005, five in

2006, four in 2007, four in 2008, four in 2009, and two in 2010 as evidence of this commitment. R. 37–38, 285. The difficulty with her argument, however, is that according to the medical records, her treatment for migraines began in 2009. There is virtually no medical evidence of chronic migraine headaches before that time; only Plaintiff's self-report. Nor is there any evidence, other than Plaintiff's testimony, as to why she was terminated from so many jobs.

■ Finally, it is important to note that the ALJ is not required to cite conclusive evidence that Plaintiff can in fact hold full-time employment in order to find her claim that she is disabled not credible. The burden to prove the existence of functional limitations of her impairments is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). In other words, the fact that the daily activities that she admitted she performed were not consistent with the ability to engage in full-time employment is neither surprising nor determinative. Rare is the disability claimant who admits to engaging in daily activities that belie his or her claim that he or she is unable to hold a job. In assessing a claimant's statements about the intensity, persistence and limiting effects of her pain or other symptoms, the question before the ALJ is not whether Plaintiff admitted activities that showed she could work; the question was whether she was a credible witness. One factor the ALJ may consider in making that determination is whether the level of activity a claimant admits is consistent with the degree of limitation she claims. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir.2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous nota-

tions in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability. These are exactly the type of factors the ALJ was required to consider."). Where the ALJ concludes a claimant is not credible, the ALJ is free, like a jury in a criminal case, to reject the claimant's testimony in whole or in part unless there is other, more convincing evidence to support it. On review, the ALJ's credibility determination will be overturned only if it is "patently wrong." *Id.* at 367 (citing *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir.2008). On remand, the ALJ should reconsider her credibility determination in light of these principles.

## C. Expert Opinions

Plaintiff also argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Russo, her treating physician. On October 8, 2012, Dr. Russo completed a "Headaches Residual Functional Capacity Questionnaire" that Plaintiff explained her lawyer gave her. R. 739. In completing the Questionnaire, Dr. Russo listed a diagnosis of migraine headaches and chronic neck and back pain. He noted that Plaintiff had been having migraine headaches since she was 10 years old. He described the symptoms Plaintiff reportedly experienced when she was having a severe migraine headache and estimated their frequency at eight per month to daily, depending on triggers. R. 548. As to duration, Dr. Russo estimated they would last from two hours to between two and four days. He cited the previous MRIs of Plaintiff's cervical, thoracic and lumbar spine as "positive test results and objective signs of your patient's headaches," and listed "history of head injury," "Migraine" and "Traumatic Brain Injury 1996–2nd MVA" as an "impairment(s) that could reasonably be expected to explain your patient's headaches." R. 549. To the question asking whether his patient was a malingerer, Dr. Russo checked "no." He listed Plaintiff's prognosis as fair, but also stated she would be precluded from performing even basic work activities and need a break from the workplace when she had a headache, which he thought would occur once or twice a week and last one to two hours. R. 550. Dr. Russo also thought Plaintiff capable of low stress jobs, noting that if she avoids triggers, she was less likely to get headaches. She would have good days and bad days, and Dr. Russo estimated she would on average be absent from work as a result of her impairment more than four times per month. Asked to identify any additional tests or procedures he would advise to fully assess Plaintiff's impairments, symptoms and limitations, Dr. Russo wrote: "None—Has had 20 years of multiple doctors + evaluations." R. 551. The ALJ gave Dr. Russo's opinions expressed in the Questionnaire "little weight because it is inconsistent with the evidence as a whole, including the noted reasonable control of headache symptoms with appropriate medication." R. 87. Plaintiff contends that "this conclusory, one-sentence rejection of treating source Dr. Russo provides no explanation for why the ALJ rejected Dr. Russo's evidence (other than the reference to plaintiff's 'control' of headaches, which is in error....)". Pl.'s Br. in Supp. 13. This, too, is an issue the ALJ should revisit on remand.

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician on the nature and severity of an impairment if (1) it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is "not inconsistent with other substantial evidence." *Larson v. Astrue,* 615 F.3d

744, 749 (7th Cir.2010); 20 C.F.R. § 404.1527(c)(2); *see also Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir.2013). If the ALJ does *not* ascribe controlling weight to the physician's opinion, the ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson,* 615 F.3d at 749. Put another way, "[e]ven though the ALJ was not required to give [the treating physician's] opinion controlling weight, [the ALJ] was required to provide a sound explanation for his decision to reject it and instead adopt [the state agency physician's] view." *Roddy,* 705 F.3d at 636 (citations omitted).

▮ Plaintiff contends that Dr. Russo's opinions are entitled to controlling weight because they are "supported by medically acceptable clinical evidence, and are consistent with substantial evidence in the record...." Pl.'s Br. in Supp. 15. She points to Dr. Cupino and Dr. Lindley as other treating physicians who gave consistent assessments of her abilities. *Id.* at 14. But neither Dr. Cupino nor Dr. Lindley provided an assessment of Plaintiff's functional capacity or her ability to perform work-related activities on an ongoing basis. Dr. Lindley was a Pain Management Specialist who saw Plaintiff only three times over a one-month period in late 2011 at the request of Dr. Cupino. R. 455–64. While Dr. Lindley did give Plaintiff an "oswestry score of 43 out of 54 at her initial visit and a 46 out of 54 on her second visit, both indicating severe functional impairment," he also discontinued her Vicodin prescription and had her sign a "narcotic agreement." R. 457, 461. There is no record of Plaintiff returning to Dr. Lindley following the steroid injections he administered on December 15, 2011, or any further follow-up. R. 463–64.

Moreover, there is other substantial evidence that is inconsistent with the limitations offered by Dr. Russo. State consulting expert Syd Foster, D.O., after reviewing the entire medical record, concluded on February 10, 2012, after a review of the entire record that Plaintiff had an RFC of light work with limited exposure to unprotected heights, hazardous machinery, and odors/perfumes." R. 481. State consultant Mina Khorshidi, M.D., likewise concluded after her review of the record on October 3, 2012, that Plaintiff could perform light work. R. 64. As to Plaintiff's mental impairments, state psychologist Kyla King appears to have simply repeated the limitations that Dr. Weber found. R. 71–72. State psychologist Susan Donahoo, on the other hand, concluded from her review of the record on February 13, 2012, that Plaintiff did not have a severe mental impairment. R. 482. These contrary views entitled the ALJ to avoid giving "controlling weight" to Dr. Russo's opinion under the second prong of the treating physician rule. *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir.2008) ("There was evidence—the report of the nonexamining consultant—that contradicted the reports of the treating physicians. So the presumption [of controlling weight] falls out and the checklist comes into play.").

There is also the question of whether Dr. Russo's opinion meets the first prong of the rule: Is it well-supported by medically acceptable clinical and laboratory diagnostic techniques? The Agency regulations distinguish between "medically acceptable clinical and laboratory diagnostic techniques" and the claimant's own statement of symptoms:

Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory find-

ings, not only by your statement of symptoms.

20 C.F.R. § 404.1508. The regulations further define signs, symptoms, and laboratory findings. Symptoms are "[the claimant's] own description of your physical or mental impairment." 20 C.F.R. § 404.1528(a). Signs are

> anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

*Id.* § 404.1528(b). Finally, laboratory findings are "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id.* § 404.1528(c).

Here, the "medically acceptable clinical and laboratory diagnostic techniques" supported, at most, that Plaintiff had chronic neck pain and possibly migraine headaches, though it is less than clear what clinical and laboratory diagnostic techniques were used to confirm Plaintiff's complaints of severe migraines. In any event, it appears that there were no such techniques that supported the severity, frequency, or duration of Plaintiff's headaches and neck pain. For that information, all of the doctors, including Dr. Russo, were entirely dependent upon the history Plaintiff provided and her description of the pain she experienced. Incorporating a claimant's descriptions of her symptoms into her doctor's notes does not transform them into "medically acceptable

clinical and laboratory diagnostic techniques."

Certainly, an MRI constitutes a medically acceptable laboratory diagnostic technique for determining spinal abnormalities. But the MRIs of Plaintiff's cervical, thoracic, and lumbar spine, though revealing some abnormalities in the cervical region and early signs of disc degeneration, led none of the doctors who viewed them to conclude surgical intervention was called for. R. 465–67. Other than a couple of steroid injections and an abandoned plan for physical therapy, virtually no treatment for Plaintiff's neck problems appears to have been suggested. And the only laboratory diagnostic technique employed to assess her complaints of severe headaches was a CT scan performed at Aurora during Plaintiff's April 12, 2012 visit to the ER. There were no relevant abnormalities. R. 700.

■ Absent medically acceptable clinical and laboratory diagnostic techniques that provide substantial support to a treating physician's opinion as to the intensity, persistence, and functionally limiting effects of a claimant's impairments, a treating physician's opinion is not entitled to controlling weight. But the ALJ cannot simply disregard the opinion without first analyzing it using the checklist of factors set forth in the regulation: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with medical signs, laboratory findings and explanations; (4) the consistency of the opinion with the evidence as a whole; (5) the specialization of the source of the opinion; and (6) other factors such as the source's understanding of the disability program and the claimant's entire file. *Bauer*, 532 F.3d at 608; 20 C.F.R. § 404.1527(c)(2). Of course, where a treating physician's opinion is based almost entirely on the

claimant's subjective complaints, the ALJ may discount it when he has found that the claimant's complaints are not credible. *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008). In such cases, the question of which physician's report to credit can collapse into the credibility issue. *Bates v. Colvin,* 736 F.3d 1093, 1100 (7th Cir.2013).

Whether this is such a case, or whether there are other reasons to disregard Dr. Russo's opinion as to the severity of Plaintiff's impairments and their functional limitations is for the ALJ to determine. To be sure, the massive and disjointed medical records ALJs are called upon to decipher and the volume of cases they are required to decide pose serious obstacles to the kind of written analyses and explanation that the case law governing judicial review of the Commissioner's decisions requires. Hopefully, the Court's effort to detail the medical evidence in chronological order here will aid the ALJ in fulfilling that task on remand.

## III. CONCLUSION

For the reasons set forth above, the decision of the Commissioner is reversed and remanded pursuant to 42 U.S.C. § 405(g) (sentence four). On remand, the ALJ should properly incorporate the mental functional impairments she found into the RFC and the hypothetical question posed to the vocational expert. The ALJ should also revisit her analysis of the claimant's credibility and the weight given to the treating physician.

**SO ORDERED** this *23rd* day of February, 2016.